**UNITED SERVICES AUTOMOBILE ASSOCIATION, Appellant,**

v.

**Starling GORDON and Ella Gordon, Appellees.**

No. 04–01–00714–CV.

Court of Appeals of Texas, San Antonio.

Oct. 30, 2002.

Rehearing Overruled March 12, 2003.

Daniel McNeel Lane, Jr., Thomas E. Sanders, Jo Beth Eubanks, Aikin, Gump, Strauss, Hauer & Feld, L.L.P., San Antonio, for Appellant.

Robert W. Loree, Loree, Hernandez & Lipscomb, PLLC, Todd Lipscomb, Law Office of Todd Lipscomb, and Steven R. Saindon, San Antonio, for Appellees.

Sitting: PHIL HARDBERGER, Chief Justice, ALMA L. LÓPEZ, Justice, SANDEE BRYAN MARION, Justice.

Opinion by PHIL HARDBERGER, Chief Justice.

United Services Automobile Association ("USAA") appeals the trial court's judgment in favor of Starling and Ella Gordon ("Gordons") in a lawsuit alleging that the foundation movement at the Gordons' residence was caused by plumbing leaks. USAA asserts four issues, contending: (1) the causation testimony of the Gordons' expert was unreliable; (2) the trial court erred in admitting a report of another expert; (3) the evidence is insufficient to support a recovery of damages for extra-contractual liability; and (4) additional living expenses are not recoverable unless and until incurred. We reverse the portion of the trial court's judgment awarding damages for extra-contractual liability and the award for additional living expenses. We affirm the trial court's conditional award of contractual damages and attorneys' fees.

## BACKGROUND

The Gordons purchased their home in 1994. The house was built in 1973. Around 1998, the Gordons noticed additional cracks in their walls and contacted a foundation company. The foundation company recommended that the Gordons file an insurance claim to determine if the foundation movement was caused by plumbing leaks. The Gordons filed a claim with USAA in August of 1998. Hydrostatic plumbing tests revealed two leaks. USAA hired John W. Dougherty with Geotechnical Consultants, Inc. to determine if the plumbing leaks were causing foundation movement. Based on Dougherty's conclusion that the foundation movement was caused by seasonal weather changes,

not plumbing leaks, USAA denied the Gordons' claim.

The Gordons filed suit in district court and hired Jim Linehan, who prepared a report stating that the foundation movement was caused by plumbing leaks. The Gordons non-suited the district court case and filed suit in county court. The Gordons hired a different engineer, James Andrews, who testified that the foundation movement was caused by plumbing leaks.

USAA filed a pre-trial motion to exclude the testimony of Andrews and Linehan on the basis that their testimony was unreliable. The Gordons agreed not to call Linehan as an expert witness, and the trial court denied the motion with regard to Andrews' testimony.

The jury found that USAA failed to comply with the terms of the Gordons' insurance policy because USAA failed to pay for damages to the Gordons' residence. The jury further found that USAA engaged in an unfair or deceptive act or practice, engaged in unconscionable conduct, and failed to comply with its duty of good faith and fair dealing. The Gordons elected to recover on their DTPA claim and were awarded $100,000 in damages (the jurisdictional limit of the county court) plus attorneys' fees.

### RELIABILITY OF ANDREWS

In its first issue, USAA contends that the trial court abused its discretion in admitting Andrews' testimony because the testimony was not reliable.

Whether the trial court properly admitted Andrews' testimony is subject to an abuse of discretion standard of review. *Helena Chem. Co. v. Wilkins*, 18 S.W.3d 744, 752 (Tex.App.-San Antonio 2000), *aff'd*, 47 S.W.3d 486 (Tex.2001). In order to be admissible, Andrews testimony must be relevant and reliable. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 556 (Tex.1995). To be reliable, Andrews' testimony must be grounded in scientific method and procedure such that it amounts to more than subjective belief or unsupported speculation. *Gammill v. Jack Williams Chev., Inc.*, 972 S.W.2d 713, 720 (Tex.1998).

In *State Farm Lloyds v. Mireles*, 63 S.W.3d 491 (Tex.App.-San Antonio 2001, no pet.), this court considered the admissibility of expert testimony on the same issue presented in the instant case—testimony regarding whether foundation movement was caused by plumbing leaks. In *Mireles*, we concluded that the expert testimony was not amenable to a strict application of the *Robinson* factors. 63 S.W.3d at 499. We therefore apply the reliability analysis set forth in *Gammill*.

In rejecting the application of the *Robinson* factors to all expert testimony, the *Gammill* court noted by analogy, "a beekeeper need not have published his findings that bees take off into the wind in a journal for peer review, or made an elaborate test of his hypotheses. Observations of enough bees in various circumstances to show a pattern would be enough to support his opinion. But there must be some basis for the opinion offered to show its reliability." 972 S.W.2d at 726. Applying the *Gammill* test, the trial court only abused its discretion in admitting Andrews' testimony if too great an analytical gap existed between the data and Andrews' opinion or if Andrews failed to rule out other possible causes of the foundation movement. *See id.* at 727; *Mireles*, 63 S.W.3d at 494-95. The trial court was not required to determine whether Andrews' conclusions were correct, but only whether the analysis used to reach them was reliable. *See id.*

## A. Underlying Test Data

■ Andrews relied on the same testing data relied on by USAA's expert which USAA in turn relied on to deny the Gordons' claim. The only complaint Andrews made with regard to the data was that the flow test was conducted on the same day as the hydrostatic test. Andrews testified that it is common in the industry for engineers to rely on data gathered by other people. USAA contends that Gordon could not rely on its data to support a plumbing leak theory because its data revealed no leak when a flow test was conducted; therefore, the data did not support Gordon's plumbing leak theory. However, the hydrostatic tests did reveal plumbing leaks. Whether evidence of plumbing leaks based on hydrostatic tests should be rejected because those tests do not reflect normal conditions is a fact question for the jury.

The jury was presented with evidence regarding the difference between a hydrostatic test and a flow test and that a hydrostatic test is not intended to show what a pipe may do under normal conditions. Julie Blakemore, the insurance adjuster, stated that no plumber had ever told her that flow tests accurately replicate normal use conditions within a home. Blakemore also testified that she had seen flow tests where water was actually gained during the test. USAA's expert, John Dougherty, discounted Bryco's plumbing test report that showed a slow leak that continued to drop at the end of 30 minutes. Dougherty's position was that the water did not continue to drop at the end of 30 minutes. Bryco's reported result is reflected in a memorandum prepared by Blakemore that was introduced as a trial exhibit. Dougherty admitted that flow tests can have problems. Dougherty stated that he also had seen flow tests that gained water, and Dougherty admitted that running a flow test on the same day as a hydrostatic test can give inaccurate results. All of this evidence raised a fact issue regarding whether or not a plumbing leak existed, and the trial court did not abuse its discretion in allowing Andrews to testify regarding his theory based on the existence of a plumbing leak.

## B. Other Possible Causes

Unlike the testimony in *Mireles* in which the experts disagreed with regard to several potential causes of foundation movement, USAA's expert agreed with Andrews that the foundation movement was not caused by drainage, soil characteristics, vegetation or an abnormal water source such as an underground spring. The experts only disagreed with regard to whether the foundation movement was caused by seasonal weather changes or the plumbing leaks. Andrews gave several reasons for ruling out seasonal weather changes as a possible cause of the foundation movement, including:

(1) The soil tests revealed that more "fill" dirt was located at the front of the house. "Fill" dirt is less compacted and more likely to "settle" due to seasonal changes. However, the elevations showed that the front of the house was higher than the back of the house.

(2) The same seasonal changes would occur around the entire perimeter of the house; therefore, seasonal changes cannot account for the higher elevations only in the front of the house.

(3) Research data showed that seasonal changes do not cause moisture changes beyond 4–5 feet from the perimeter; however, the test results showed that moisture changes were occurring beyond the 4–5 feet.

(4) USAA's own expert reported in a study he conducted that movement due to seasonal moisture change slows or stops after 15 years and the Gordons reported that the noticeable cracks began *occurring* more than 15 years from the date the house was built.

(5) Andrews explained how the contour elevations excluded the theory of seasonal changes as a potential cause of the movement.

Another possible cause presented during trial was the Gordons' use of a soaker hose around the perimeter of the house. Andrews explained that if the soaker hose was the cause of the movement, heaving would occur around the entire perimeter because the soaker hose applied the same amount of water around the entire perimeter.

The trial court did not abuse its discretion in rejecting USAA's challenge that Andrews failed to rule out other possible causes. Andrews gave numerous reasons for rejecting seasonal changes as a possible cause of the foundation movement and gave reasons for ruling out the soaker hose as a potential cause. The trial court was not required to determine whether Andrews' conclusions were correct, but only whether the analysis used to reach them was reliable. *Gammill,* 972 S.W.2d at 726.

## C. Foundation Movement Caused by Plumbing Leaks

Unlike the testimony in *Mireles* in which the expert relied on foundation experience with large commercial buildings, Andrews relied on his experience in conducting over 1,000 forensic investigations on foundations. "Observations of enough [foundations] in various circumstances to show a pattern [is] enough to support [Andrews'] opinion. But there must be some basis for

the opinion offered to show its reliability." *Gammill,* 972 S.W.2d at 726.

In *Mireles,* the court asserted, "it is undisputed that Schneider stands alone among foundation experts in his opinion and theories. Both he and the State Farm experts agree that Schneider's theories are not generally accepted among experts." 63 S.W.3d at 499. In the instant case, Andrews relied on a published treatise written by Robert Wade Brown that Andrews stated was relied upon by engineers and was found reliable in the engineering community. That treatise discusses that migration of water from a plumbing leak, and Andrews explained the method by which water can migrate from a plumbing leak. In addition, during cross-examination at trial, Dougherty recognized that several other engineers disagree with Dougherty's belief that water from a plumbing leak will not migrate along a plumbing trench. Furthermore, Andrews testified that the data from the test results supported his theory because the soil test data showed greater moisture from the test sites located away from the identified leak locations and because the liquidity index documented the greatest soil swelling at the front of the house.

## D. Conclusion

Unlike *Mireles,* Andrews testified based on his experience with similar foundations, and the evidence showed that his theory was supported in a published treatise relied on in the engineering community and by other engineers. Finally, Andrews was able to show how the data from the tests supported his theory. Because the trial court was not required to determine whether Andrews' conclusions were correct, but only whether the analysis used to reach them was reliable, the trial court did not abuse its discretion in admitting Andrews testimony because it was sufficiently

reliable. *Gammill,* 972 S.W.2d at 726. USAA's first issue is overruled.

## LINEHAN REPORT

In its second issue, USAA contends that the trial court erred in admitting the report prepared by Jim Linehan. Jim Linehan had prepared an expert report regarding the plumbing leak migration theory in connection with the Gordons' district court case. After the district court case was non-suited and the county court case was filed, USAA filed a pretrial motion to exclude the report, asserting that Linehan was not a qualified expert.

On August 16, 2001, USAA filed a notice of a rule 11 agreement and attached a rule 11 agreement entered into between the parties by letter dated July 12, 2001. The pertinent portion of the agreement stated, "Plaintiffs agree that they will not call Jim Linehan as an expert in the above-styled matter." Before signing the agreement, Gordons' counsel struck through the portion of the sentence that read, "and that Mr. Linehan's report, observations, and testimony will not be a basis for James Andrews' testimony in this case." At the hearing on the pretrial motions, the Gordons' counsel represented to the trial court that Linehan's report would not be introduced, only the pier-plan diagram prepared by Linehan.

The Gordons respond to USAA's complaint on appeal by contending that the report was admissible because Dougherty relied on the report; however, the testimony is contrary to this statement. Dougherty never testified that he relied on the report. He testified that he did not rely on the report and disagreed with the opinions expressed in the report. The Gordons also assert that USAA waived any reliability objection to Linehan's testimony by deciding not to proceed with a *Daubert/Robinson* hearing against him. How-

ever, the record reflects that USAA re-urged its *Daubert/Robinson* objection when the trial court was deciding whether to admit the report. At the conclusion of Dougherty's testimony, USAA's counsel objected "to the admission of Mr. Linehan's work product under Robinson, Havner, and Mireles." The trial court overruled the objection.

■ During trial, the trial court admitted the report on the basis that Dougherty had relied on the report. However, as previously noted, Dougherty testified that he did not rely on Gordons' report and did not agree with any of Linehan's opinions. The parties had agreed that Linehan would not testify, and the Gordons' attorney represented to the court at the pretrial hearing that the report would not be admitted. No evidence was introduced to prove that Linehan was qualified to provide the expert report; therefore, the only basis for admitting the report was that Dougherty had been provided a copy of the report even though Dougherty testified that he did not rely on the report.

The admission and exclusion of evidence is committed to the trial court's sound discretion; thus, we review this issue under an abuse of discretion standard. *City of Brownsville v. Alvarado,* 897 S.W.2d 750, 753 (Tex.1995). A trial court abuses its discretion when it acts without regard for any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985).

An expert may disclose on direct examination, or be required to disclose on cross-examination, the facts or data underlying his opinion. TEX.R. EVID. 705. Presumably, this rule was the basis for the trial court's ruling. However, the only evidence in our record is that Dougherty did not rely on Linehan's opinion which also is supported by the fact that Linehan's re-

port is contrary to Dougherty's opinion. Therefore, the admission of Linehan's report was contrary to the guiding rule set forth in rule 705. Linehan's report was not admissible under rule 705 because Dougherty did not rely on the report in reaching his opinion; he only reviewed the report. Therefore, the trial court erred in admitting the report.

■ The question becomes whether the error probably caused the rendition of an improper judgment. TEX.R.APP. P. 44.1(a); *Gee v. Liberty Mut. Fire Ins. Co.,* 765 S.W.2d 394, 396 (Tex.1989). Erroneous rulings on the admissibility of evidence ordinarily do not result in reversible error where the evidence in question is cumulative and not controlling on a material issue dispositive of the case. *Id.* This case involved a classic battle between two experts—Dougherty and Andrews. The focus of the case was on this testimony. Linehan's report was cumulative of Andrews' testimony and was not controlling on a material issue dispositive of the case. Therefore, we conclude that the trial court's error did not cause the rendition of an improper judgment. USAA's second issue is overruled.

## EXTRACONTRACTUAL CLAIMS

In its third issue, USAA contends that the evidence is legally and factually insufficient to support the jury's finding of extra-contractual liability in relation to Gordons' claims that USAA violated the insurance code, breached its duty of good faith and fair dealing, and acted unconscionably. USAA further contends that the evidence is insufficient to support recovery under the insurance code, DTPA or the tort claim of bad faith because the only damages proven and awarded were damages arising from USAA's denial of the claim. The Gordons respond that these issues are not relevant because the Gordons would

receive the same award of damages under their contractual claim given the jurisdictional limits of the county court. USAA correctly notes that it has an obligation to challenge each ground supporting the trial court's judgment.

■ We agree with USAA that the Gordons failed to prove any damages apart from those stemming from the denial of the claim. An insured is not entitled to recover extra-contractual damages unless the complained of actions or omissions cause injury independent of the injury resulting from a wrongful denial of policy benefits. *See Provident American Ins. Co. v. Castaneda,* 988 S.W.2d 189, 198–99 (Tex.1998); *MacIntire v. Armed Forces Benefit Ass'n,* 27 S.W.3d 85, 92 (Tex.App.-San Antonio 2000, no pet.); *see also Parkans Int'l. LLC. v. Zurich Ins. Co.,* 299 F.3d 514, 519 (5th Cir.2002). In this case, the jury charge contained the same two categories of damages for each of the alleged causes of action—repair costs and additional living expenses, and the jury awarded identical amounts for damages on each claim. Therefore, USAA cannot, as a matter of law, be liable for the extracontractual claims. *See MacIntire,* 27 S.W.3d at 92. USAA's third issue is sustained.

## ADDITIONAL LIVING EXPENSES

In its fourth issue, USAA contends that the trial court erred in awarding the Gordons additional living expenses because the Gordons are not entitled to recover the expenses unless and until they are incurred.

The Gordons' insurance policy states that if a loss caused by a covered peril makes their residence wholly or partially untenantable, USAA covers:

additional living expense, meaning a necessary and reasonable increase in living expense you incur so that your house-

hold can maintain its normal standard of living.

At trial, Mrs. Gordon testified that the Gordons would be required to move from the house while the repairs are being made. Mrs. Gordon further testified:

> Well, we've investigated how much it would, you know, pretty much what the expenses would be. We were looking at, you know, probably $1500 a month to rent a house, you know, for a period of six months. We've investigated how much it [would] cost to move. We've done a lot of moving in the years past at least, you know, 12, 13 moves we've made with the military. And so we have some idea of how much we have, and we've got estimates 4– to $500, you know, to move our furniture out of our house and move it back in. And then there are additional costs of utilities, you know, and another place, plus the utilities at our house while those repairs are being made. And that's somewhere in the neighborhood of $1800 a month for additional out-of-pocket expenses of living at another house.

 USAA contends that the policy precludes the award of additional living expenses until those expenses are incurred. Insurance policies are subject to the same rules of construction as other contracts. *See Trinity Universal Ins. Co. v. Cowan,* 945 S.W.2d 819, 823 (Tex.1997). Terms of an insurance policy are to be given their plain, ordinary, and generally accepted meaning of words unless the policy shows that the terms have been used in a technical or different sense. *Ramsay v. Maryland Am. Gen. Ins. Co.,* 533 S.W.2d 344, 346 (Tex.1976). The term "incur" generally means "become liable or subject to" or "become liable to pay." *Quick v. City of Austin,* 7 S.W.3d 109, 133 n. 2 (Tex.1998) (rehearing); *Keever v. Finlan,*

988 S.W.2d 300, 308 (Tex.App.-Dallas 1999, pet. dism'd).

No Texas case appears to have discussed whether additional living expenses must be incurred in order for an insured to recover additional living expenses as damages. USAA cites two cases from other states to support this contention. In *United Services Auto. Ass'n v. Wade,* 544 So.2d 906, 912–13 (Ala.1989), the court held that the evidence was sufficient to support an award of additional living expenses because the evidence showed that the Wades had incurred the expense. In *Young v. State Farm Fire & Cas. Ins. Co.,* 426 So.2d 636, 644–45 (La.Ct.App.1982), *writ denied,* 433 So.2d 171 (La.1983), the court held that the evidence was insufficient to support an award of additional living expenses since the plaintiff failed to introduce any evidence to show such expenses were actually incurred.

 We agree with USAA's contention. Giving the term "incur" its generally accepted meaning, the Gordons are not entitled to recover additional living expenses until they become liable for those expenses. Our conclusion is bolstered by the fact that a Pennsylvania court held that an issue of fact was raised as to whether an insurance company acted in bad faith in calculating the amount to be paid under a policy in additional living expenses without waiting to determine the amount of expenses the insured would actually incur. *Riethmiller v. Bedford County Grange Mut. Ins. Co.,* 52 Pa. D. & C. 4th 190 (Pa.Com.Pl.2001). If the law precludes an insurance company from calculating the amount to be paid in additional living expenses in advance, a trial court should similarly be precluded from awarding additional living expenses before those expenses are incurred.

USAA's fourth issue is sustained.

**444**

## Conclusion

The portions of the trial court's judgment awarding the Gordons damages for their extracontractual claims and awarding additional living expenses are reversed, and judgment is rendered that the Gordons take nothing on their extracontractual claims or claim for additional living expenses. We modify the trial court's judgment to exclude the award of additional living expenses and affirm the remainder of the trial court's judgment as modified.