OPINION
 

 Opinion by ALMA L. LÓPEZ, Chief Justice.
 

 United Services Automobile Association (“USAA”) appeals the trial court’s judgment in favor of Kathleen Pigott (“Pigott”) in a lawsuit alleging that the foundation movement at Pigott’s residence was caused by plumbing leaks. USAA asserts four issues, contending: (1) Pigott’s expert, James Bradley, was not qualified to testify and his testimony was unreliable; (2) the evidence is legally and factually insufficient to support the jury’s verdict; (3) the evidence is legally and factually insufficient to support the allocation of damage caused by the plumbing leak; and (4) the trial court erred in disregarding the jury’s award of zero attorneys’ fees. We affirm the trial court’s judgment.
 

 Background
 

 Pigott purchased a home in San Antonio in 1980. At the time she purchased the home, an inspection revealed a drainage problem that required the installation of a French drain to alleviate the problem. In June or July of 1994, Pigott hired James Bradley to evaluate her foundation because of the cracks in her walls. Bradley concluded that the left rear corner of her home had “down warped probably from excessive moisture reducing the soil bearing capacity or consolidation of the subsoil.” To correct this problem, Pigott retained Bless Foundation to install thirteen piers to raise the foundation back to level. At the time the piers were installed, the gravel in the French drain was removed and inadvertently commingled with dirt and clay to some extent before being replaced.
 

 In 1996, 130,000 gallons of water leaked from a water line at the southeast corner of Pigott’s home. Pigott made an insurance claim which was investigated by USAA. USAA hired G.D. Friesenhahn Plumbing Company (“Friesenhahn Plumbing”) to investigate whether any additional plumbing leaks existed. One additional plumbing leak was identified in the kitchen. Simpson Group, an engineering firm, was hired to determine if the plumbing leak was the cause of the foundation movement which was causing the walls in Pi-gott’s home to crack. Simpson Group obtained elevations and soil samples. Simpson Group concluded that the founda
 
 *614
 
 tion movement was unrelated to the plumbing leak. Friesenhahn Plumbing recommended that the entire plumbing system be replaced because the structure of the house required the leak to be accessed from back to front and because the existing system was made out of cast iron and was deteriorating. In addition to paying to access the plumbing system, which was an expense covered by Pigott’s policy, USAA also paid for the replacement of the system, which was not a covered expense. The plumber testified that the plumbing system was in bad condition with many leaks.
 

 In 1998, Pigott called USAA to report additional movement. USAA contacted Simpson Group to re-investigate. No plumbing leaks were found. Simpson Group again concluded that no foundation movement had resulted from plumbing leaks. In response to Pigott’s request for recommendations, Simpson Group recommended that she contact Bless Foundation for a possible warranty claim.
 

 In January of 1999, Pigott contacted USAA when she heard water running. USAA hired Friesenhahn Plumbing, which identified a leak at an incoming water line. USAA offered to hire a different engineering company, and Pigott selected Arroyo Engineering from the list of names USAA provided to her. Testing revealed no additional plumbing leaks, and Arroyo Engineering concluded that the leak did not cause any foundation movement. In response to Pigott’s request for advice, Arroyo concluded that there was evidence that the piers were moving and recommended that she contact Bless Foundation regarding the piers.
 

 Pigott subsequently contacted an attorney who referred her to Bradley for an independent determination of whether the plumbing leaks had caused foundation movement. Bradley concluded that the leaks had caused the movement. Pigott provided a copy of Bradley’s report to USAA. USAA sent the report to Simpson Group and Arroyo to review. Simpson Group and Arroyo both responded, disagreeing with Bradley’s conclusions.
 

 Pigott filed a lawsuit against USAA claiming the damage to her home was covered by insurance. The case was tried to a jury. The jury found that 40% of the damage to Pigott’s home was caused by plumbing leaks and that the cost of the repairs to Pigott’s home would be $131,200. The jury also found that the reasonable fee for the services of Pigott’s attorney was as follows: (1) $0 for preparation and trial; (2) $20,000 for an appeal to the court of appeals; and (3) $10,000 for an appeal to the Texas Supreme Court. The trial court entered judgment awarding Pigott $52,480 in damages plus equitable pre-judgment interest of $30,596 and mandatory statutory interest of $55,072. The trial court also set aside the jury’s award of $0 for attorneys’ fees for preparation and trial and awarded Pigott $93,250 in attorney’s fees plus conditional appellate attorney’s fees. USAA timely filed this appeal.
 

 Qualifications of Biiadley
 

 USAA contends that Bradley was not qualified to testify because he was an industrial engineer, not a civil or geotech-nical engineer. USAA relies on
 
 Broders v. Heise
 
 to support its contention.
 

 The qualification of a witness as an expert is within the trial court’s discretion.
 
 Broders v. Heise,
 
 924 S.W.2d 148, 151 (Tex.1996). A trial court abuses its discretion if it acts without reference to guiding rules or principles.
 
 Id.
 
 The party offering the expert’s testimony bears the burden of proving that the witness is qualified under Texas Rule of Civil Procedure 702.
 
 Id.
 
 The rule requires that experts be qualified “by knowledge, skill, experience,
 
 *615
 
 training, or education,” and that their testimony “assist the trier of fact.”
 
 Id.
 
 at 153.
 

 In
 
 Broders,
 
 the Texas Supreme Court addressed the effect of medical specialization as follows:
 

 Moreover, given the increasingly specialized and technical nature of medicine, there is no validity, if there ever was, to the notion that every licensed medical doctor should be automatically qualified to testify as an expert on every medical question. Such a rule would ignore the modern realities of medical specialization.
 

 Id.
 
 at 152. In
 
 Broders,
 
 the Texas Supreme Court concluded that an emergency room physician was not qualified to testify regarding whether the decedent, Kathleen Heise, would have survived if her head injury had been diagnosed and treated earlier.
 
 Id.
 
 at 151. Two neurosurgeons testified that the injury was inoperable and untreatable.
 
 Id.
 
 The Texas Supreme Court reasoned, “While [the emergency room doctor] knew both that neurosurgeons should be called to treat head injuries and what treatments they could provide, he never testified that he knew, from either experience or study, the effectiveness of those treatments in general, let alone in this case.”
 
 Id.
 
 at 153. The court cautioned, however, that its holding did not “mean that only a neurosurgeon can testify about the cause in fact of death from an injury to the brain, or even that an emergency room physician could never so testify. What is required is that the offering party establish that the expert has ‘knowledge, skill, experience, training, or education’ regarding the specific issue before the court which would qualify the expert to give an opinion on that particular subject.’ ”
 
 Id.
 
 at 153-54.
 

 In this case, Bradley testified that although his degree was in industrial engineering, he practiced civil engineering in the Army for twenty years. After retiring from the Army, he worked with a home builder in analyzing and recommending changes to foundation plans. Finally, he has worked for an engineering firm conducting forensic investigations of foundations and engaging in foundation design. Bradley estimated that he had investigated approximately 6,000 foundations. He explained that he investigated foundations in connection with the sale and purchase of homes and at the request of homeowners who were experiencing problems. Bradley also investigated homes at the request of builders who were unable to sell certain homes because of problems. Furthermore, Bradley testified that he had taught courses for a few insurance companies, including USAA, to train adjusters on how to recognize homes with plumbing leaks. Finally, Bradley testified that he had experience in designing foundations and estimated that he designed approximately ten foundations a week.
 

 Rule 702 requires that experts be qualified “by knowledge, skill, experience, training, or education.” We hold that the trial court did not abuse its discretion in concluding that Bradley was qualified based on his knowledge, experience, and training.
 

 Reliability of BRádley’s Testimony
 

 USAA contends that the trial court abused its discretion in admitting Bradley’s testimony because the testimony was not reliable. Because Bradley’s testimony is unreliable, USAA contends that there is no evidence to support the finding that plumbing leaks caused the foundation movement.
 

 Whether the trial court properly admitted Bradley’s testimony is subject to an abuse of discretion standard of review.
 
 Helena Chem. Co. v. Wilkins,
 
 18 S.W.3d 744, 752 (Tex.App.-San Antonio 2000),
 
 aff'd,
 
 47 S.W.3d 486 (Tex.2001). In order
 
 *616
 
 to be admissible, Bradley’s testimony must be relevant and reliable.
 
 E.I. du Pont de Nemours & Co. v. Robinson,
 
 923 S.W.2d 549, 556 (Tex.1995). To be reliable, Bradley’s testimony must be grounded in scientific method and procedure such that it amounts to more than subjective belief or unsupported speculation.
 
 Gammill v. Jack Williams Chev., Inc.,
 
 972 S.W.2d 713, 720 (Tex.1998).
 

 In
 
 State Farm Lloyds v. Mireles,
 
 63 S.W.3d 491 (Tex.App.-San Antonio 2001, no pet.), this court considered the admissibility of expert testimony on the same issue present in the instant case — testimony regarding whether foundation movement was caused by plumbing leaks. In
 
 Mireles,
 
 we concluded that the expert testimony was not amenable to a strict application of the
 
 Robinson
 
 factors. 63 S.W.3d at 499. Therefore, we apply the reliability analysis set forth in
 
 Gammill.
 
 Applying the
 
 Gammill
 
 test, the trial court abused its discretion in admitting Bradley’s testimony only if too great an analytical gap existed between the data and Bradley’s opinion or if Bradley failed to rule out other possible causes of the foundation movement.
 
 See id.
 
 at 727;
 
 Mireles,
 
 63 S.W.3d at 494-95. The trial court was not required to determine whether Bradley’s conclusions were correct, but only whether the analysis used to reach them was reliable. Mir
 
 eles,
 
 63 S.W.3d at 494.
 

 A.Underlying Test Data
 

 Bradley relied on the same testing data relied on by USAA’s expert which USAA in turn relied on to deny Pigott’s claim. This court has previously upheld the admissibility of expert testimony where the expert relies on the data collected by the insurance company’s expert.
 
 See United Services Automobile Ass’n v. Gordon,
 
 103 S.W.3d 436, 439 (Tex.App.-San Antonio 2002, no pet.);
 
 State Farm Fire & Cas. Co. v. Rodriguez,
 
 88 S.W.3d 313, 320 (Tex.App.-San Antonio 2002, pet. denied).
 

 B. Other Possible Causes
 

 Bradley gave several reasons for ruling out seasonal weather changes and vegetation as a possible cause of the foundation movement, including:
 

 (1) Bradley testified that seasonal weather changes only affected an area five to six feet from the outside beam of the home to the interior and that the manner in which Pigott’s home was constructed diminished the effect of seasonal weather changes;
 

 (2) Seasonal cyclical moisture only affects the perimeter of the house, but Pigott’s home was damaged in the interior as well as the exterior;
 

 (3) The escalated nature of the damage was not typical of seasonal moisture change, i.e., the damage to the house was dramatic in a relatively short period of time; and
 

 (4) The vegetation or trees could only affect the soil about two feet deep.
 

 C. Foundation Movement Caused by Plumbing Leaks
 

 Unlike the testimony in
 
 Múreles
 
 in which the expert relied on foundation experience with large commercial buildings, Bradley relied on his experience in conducting over 6,000 forensic investigations on foundations. “Observations of enough [foundations] in various circumstances to show a pattern [is] enough to support [Bradley’s] opinion. But there must be some basis for the opinion offered to show its reliability.”
 
 Gammill, 212,
 
 S.W.2d at 726.
 

 Bradley initially described where the interior stiffening beams would be located beneath Pigott’s home based on his knowledge of the design of foundations and the location of the load-bearing walls. In addi
 
 *617
 
 tion, Bradley knew the location of certain beams due to the excavation required when the plumbing was replaced. Furthermore, Bradley testified that the patterns in the elevations supported his understanding of the probable location of the beams going from east to west. Bradley testified that if water from a plumbing leak gets under a beam, the water will attempt to lift the beam which is a structural element and result in a greater amount of damage.
 

 Bradley testified that 130,000 gallons of water, which was the approximate amount of the water that leaked in 1996, was more than double or triple the normal household use. Bradley testified that the French drain was not designed to carry away that volume of water. Bradley testified that because the French drain could not carry away that volume of water, the water would go under the beam level of the home and begin to heave the beam up, attempting to move the whole structure. The French dram’s inability to carry away that volume of water is further demonstrated by evidence showing that no water was discharging into the dry creek behind Pi-gott’s home where the French drain was designed to take the water following the 1996 leak but water was readily discharging into the creek following the 1999 leak.
 

 Bradley testified that both the elevations and the soil samples showed that the foundation movement was attributable to a plumbing leak. The elevations taken by Simpson in 1996 show a high point in the location of the leak. The elevations also show a uniform lift, indicating that the water had leaked under a beam, which was being lifted. The elevations taken by Simpson in 2002 show that the high point had lowered, which Bradley testified was consistent with the water spreading out and diffusing the heave. Comparing the soil samples taken in 1996, 1998, and 1999, Bradley testified that the soils were increasingly wet and that the change could only be explained by plumbing leaks. Bradley explained that the soil samples went from a negative liquidity index to a positive.
 

 Although Bradley’s testimony was contrary to the testimony of Stieben and Wall, Stieben recognized that one expert, who was well known and respected in his field, opined that a two percent increase in moisture content can cause enough swell to heave a foundation. Stieben also admitted that a four percent increase in moisture content existed in the soil samples according to the boring logs; however, Stieben testified that the difference in moisture content did not “necessarily mean the moistures have changed that much.” Stie-ben - also admitted that his report referenced another report stating that “expansive soils with a liquidity index in the range of + 0.10 to + 0.30 will tend to experience little additional swell, i.e., the material is in a fully swelled state.” Moreover, Stieben admitted that the liquidity index of one of the soil samples was + 0.13; however, Stieben discounted the reference to the other report, stating that the report was based on soil samples in Mississippi and Georgia. Wall also admitted that the soil samples showed a three percent change in moisture content.
 

 Bradley’s testimony was grounded in his application of his engineering training to data regarding elevations and soil samples, and his testimony amounted to more than subjective belief or unsupported speculation. Although Bradley’s interpretation of the soil samples differed from Stieben and Wall, this difference in interpretation did not amount to an analytical gap. The trial court could have determined that the analysis Bradley used in reaching his conclusion was rehable given the conflicting testimony regarding the effect the percentage increase in moisture content had on the
 
 *618
 
 soil and whether the liquidity index of the soil samples indicated that the soil was in a swelled state. As previously noted, the trial court was not required to determine whether Bradley’s conclusions were correct, but only whether the analysis used to reach them was reliable.
 
 Míreles,
 
 63 S.W.3d at 494. We hold that the trial court did not abuse its discretion in concluding that Bradley’s testimony was reliable.
 

 Sufficiency
 

 In reviewing a no evidence claim, we view the evidence in a light that tends to support the finding of the disputed fact and disregard all evidence and inferences to the contrary.
 
 Minyard Food Stores, Inc. v. Goodman,
 
 80 S.W.3d 573, 577 (Tex.2002). If more than a scintilla of evidence exists, it is legally sufficient.
 
 Id.
 
 More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about a vital fact’s existence.
 
 Id.
 

 In reviewing a factual insufficiency point, we consider and weigh all of the evidence in the case and reverse only if the verdict is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.
 
 Cain v. Bain,
 
 709 S.W.2d 175, 176 (Tex.1998). In conducting a factual sufficiency review, we must not substitute our judgment for that of the jury, even if the evidence would clearly support a different result, and the jury is the sole judge of the credibility of the witnesses and the weight to be given to their testimony.
 
 Maritime Overseas Corp. v. Ellis,
 
 971 S.W.2d 402, 407 (Tex.1998).
 

 A. Causation
 

 Because we have determined that the trial court did not abuse its discretion in finding that Bradley’s testimony was reliable, Bradley’s testimony is legally sufficient to support the causation finding. The case then became a battle of the experts, and the jury is the sole judge of the credibility of the witnesses and the weight to be given to their testimony.
 
 See id.
 

 In this case, the jury was presented with documented evidence of plumbing leaks at Pigott’s home. Bradley testified that almost 100 percent of the damage to Pigott’s home was caused by plumbing leaks. Bradley explained how the test data supported his opinion, and he also explained the reasons he rejected the conclusions reached by the other experts as to the cause of the damage. On the other hand, the jury was presented with contrary conclusions reached by the Simpson Group and Arroyo regarding the cause of the damage, and the testimony of Stieben who disagreed with Bradley’s interpretation of the soil samples.
 

 In deciding what weight should be given to the testimony of the various experts, the jury was permitted to consider the questioning regarding whether the Simpson Group and Arroyo were biased in favor of the insurance companies. David Stringer, the USAA adjuster, admitted that he had heard that Arroyo was biased in favor of insurance companies. In addition, the jury was permitted to consider that Wall and Stieben did testify that the soil samples indicated a percentage increase in moisture content, which supported Bradley’s testimony, and that Stieben’s report contained background information supporting Bradley’s testimony that the liquidity index indicated that the soil samples were in a swelled state.
 

 Although the evidence in this case would have supported a different result, we are not permitted to substitute our judgment for that of the jury.
 
 See id.
 
 Bradley’s testimony supported a finding that the damage to the home was caused, in part, by plumbing leaks, and the jury’s finding
 
 *619
 
 is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.
 

 B. 40% Allocation
 

 In
 
 State Farm Fire & Cas. Co. v. Rodriguez,
 
 the testimony regarding the percent of damage attributable to plumbing leaks ranged from 0% to 100%. 88 S.W.3d at 322. Because the jury’s finding was within the range of the testimony presented, we upheld the jury’s finding, stating, “To hold otherwise would force a jury to accept only the exact percentage proffered by one side or the other. The jury can blend the evidence rather than relying on a single source.”
 
 Id.
 
 at 322-23.
 

 In this case, the Simpson Group and Arroyo allocated zero percentage of the damage to plumbing leaks, while Bradley testified that 99 and 44/100 percent of the foundation movement was attributable to the plumbing leaks. Although USAA’s attorney challenged him because Bradley stated that he just used that percentage as a joke, the jury was required to evaluate Bradley’s credibility as to the percentage allocation he gave. At trial, Bradley stated that the percentage he used was just a way of saying almost 100%. Because the jury’s allocation finding was within the range of the testimony presented, it is supported by sufficient evidence.
 

 Attorneys’ Fees
 

 A trial court may disregard a jury’s findings and grant a motion for judgment notwithstanding the verdict when there is no evidence upon which the jury could have based its findings.
 
 Mancorp, Inc. v. Culpepper,
 
 802 S.W.2d 226, 227 (Tex.1990). When reviewing a no evidence point, an appellate court is limited to reviewing only the evidence tending to support the jury’s verdict and must disregard all evidence to the contrary.
 
 Id.
 
 If more than a scintilla of evidence supports the jury finding, it must be upheld.
 
 Id.
 
 at 228. Thus, appellate courts must consider the evidence and inferences as they tend to support the verdict and not with a view toward supporting the judgment.
 
 Id.
 

 At trial, Pigott’s attorney, Richard Bentley, testified that he had expended 373 hours in the case to date, and he charged $250 per hour. Bentley testified regarding the breakdown of his hours, and he testified that the number of hours he had expended and his fee were reasonable. Bentley also introduced an exhibit containing a breakdown of his hours. Finally, Bentley testified regarding the complexity of the case and his experience. Although Bentley was cross-examined regarding the number of hours he had expended conducting research, the cross-examination was not extensive but is limited to a single page of the voluminous reporter’s record.
 

 USAA relies on Bentley’s testimony that he was working on a contingent fee basis to support the zero fee award. USAA asserts, “Based on this testimony, the jury was entitled to find that attorney’s fees would be the agreed upon percentage of [Pigott’s] final recovery, and to take that arrangement into account in awarding damages.” The jury, however, only awarded Pigott $131,200 in damages. Bentley’s testimony was that his fees amounted to $93,250. Furthermore, Bentley informed the jury of the effect his contingent fee arrangement should have on the jury’s findings, “So, the other aspect of the award of attorney’s fees is the reason they are allowed by statute, and under the Deceptive Trade Practices Act and the Insurance code, the intent is to make the consumer or the insured whole so that they can get compensation for their attorney and it doesn’t have to come out of their pocket. So that allows anybody, any litigant to be able to acquire quality representation. Because you can go out and hire any attorney, generally across the board, because he’s assured that if he does
 
 *620
 
 his job and proves up his case, and he proves up his attorney’s fees, the jury will award attorney’s fees, and that way there is compensation available for him. If that system broke down and juries wouldn’t award attorney’s fees, then people like Mrs. Pigott couldn’t get lawyers. People similarly situated couldn’t go out and hire competent legal counsel.”
 

 We disagree that the jury was able to award zero attorneys’ fees based on the nature of the contingent fee arrangement. Although one of the factors the jury was instructed that it could consider was whether the fee is fixed or contingent on results obtained, the question asked the jury was “What is a reasonable fee for the necessary services of Mrs. Pigott’s attorney in this case, stated in dollars and cents?” There was no evidence to support a finding that there was no reasonable fee for the necessary services of Bentley. Accordingly, the trial court did not err in disregarding the jury’s award of zero attorney’s fees.
 

 Conclusion
 

 The trial court’s judgment is affirmed.