IN THE

TENTH COURT OF APPEALS




 
 
 
 
 
 
 


 



No. 10-04-00018-CV

 

State Farm Lloyds,

                                                                      Appellant

 v.

 

Chesley E. Blacklock and 

Dianne Blacklock,

                                                                      Appellees

 

 

 



From the 249th District Court

Johnson County, Texas

Trial Court No. C200200131

 



MEMORANDUM  Opinion



 

    Chesley E. and Dianne Blacklock filed suit
against State Farm Lloyds claiming that State Farm breached its contract by not
fully paying their claim for damage to their home and foundation.  A jury found
for the Blacklocks, and State Farm appeals.  Because we find that the
Blacklocks’ experts’ opinions are unreliable and therefore no evidence, we
reverse and render a take-nothing judgment in favor of State Farm.




Background

        Chesley and Dianne Blacklock owned a
home in Johnson County for over 20 years.  During this time they experienced no
major problems with their home.  However, in 2001 problems began to occur.  Doors
in the Blacklocks’ home began rubbing against the door frames and rafters in
the roof started pulling away from the ridge.  The Blacklocks observed cracks forming
in the ceiling and walls, and cracks forming in the outside brick façade around
the windows that continued on a downward path through the foundation. 
According to Chesley, these cracks first manifested in the spring of 2001 and
then progressed rapidly.  Suspecting that something was wrong with the
foundation, the Blacklocks called Olshan, a foundation repair company.

    After testing, Olshan advised the Blacklocks
that they had a plumbing leak and to contact their homeowners’ insurance company. 
The Blacklocks contacted State Farm, their insurance carrier, and State Farm
sent American Leak Detection Company to their property.  American Leak
confirmed Olshan’s assessment that there was a plumbing leak.  The day the leak
was being repaired, Jeni McEwen, a State Farm adjuster, sent an engineer from
Norseman Engineering to assess possible damage to the house’s foundation.  Norseman
concluded that a small portion of the foundation was damaged due to the
plumbing leak, causing interior damage to a bathroom and a bedroom.  Norseman
reported that damage to the rest of the house was outside the “area of
influence” of the plumbing leak.  This damage, Norseman concluded, was caused
by changes in the moisture content of the soil due to environmental conditions
and not by the plumbing leak.

        Based on Norseman’s conclusions, State
Farm offered to pay for the interior damage in the “area of influence,” namely
the bathroom and bedroom.  The Blacklocks disagreed with Norseman’s conclusions
and filed suit against State Farm and its adjustor, McEwen, for breach of
contract and violations of the Texas Insurance Code and the Texas Business and
Commerce Code.

    Before trial, State Farm filed a motion to
exclude the opinions and testimony of Jeffrey Lineberger, an engineer and the
Blacklocks’ expert witness.  After a Daubert/Robinson hearing, the trial
court denied State Farm’s motion.  State Farm renewed its objection to
Lineberger at trial.  When the Blacklocks introduced, through Lineberger’s
testimony, the report and repair plan of their expert, James Linehan, State
Farm objected to the reliability of Linehan’s report.  State Farm also objected
to the testimony of the Blacklocks’ damages expert, Gary Pennington, because
his testimony was based entirely upon the report and repair plans of Lineberger
and Linehan, both of whom State Farm believed to be unreliable.  These
objections were overruled.

        The jury found that State Farm failed to
comply with the terms of the homeowners’ policy and awarded the Blacklocks over
$67,000 in breach of contract damages, over $30,000 in statutory damages, $100,000
additional damages for unconscionable conduct, and attorneys’ fees.  The jury
also found that the Blacklocks should take nothing against McEwen. 

    On appeal, State farm argues that that trial
court erred by (1) admitting the testimony of the Blacklocks’ experts because
their opinions were unreliable as a matter of law and constituted no evidence
of causation or damages and (2) entering judgment of $100,000 of additional
damages because the jury actually found zero damages with regards to unconscionable
conduct and there was no evidence to support unconscionable conduct.     

Expert Testimony

    State Farm argues in their first issue that
that trial court erred in admitting the testimony of the Blacklocks’ experts,
Lineberger and Pennington, and an expert report generated by Linehan because
their opinions were unreliable and constituted no evidence of causation or
damages.

Standard of Review

When reviewing a no-evidence challenge, we “view
the evidence in a light that tends to support the finding of the disputed fact
and disregard all evidence and inferences to the contrary.”  In determining
whether an expert’s testimony constitutes some evidence, however, “an expert’s
bare opinion will not suffice” and “[t]he substance of the testimony must be
considered.”  Further, “[t]he underlying data should be independently evaluated
in determining if the opinion itself is reliable.”  The proponent of the
evidence bears the burden of demonstrating that the expert’s opinion is
reliable.  If the expert’s testimony is not reliable, it is not evidence.

  

Kerr-McGee
Corp. v. Helton, 133 S.W.3d
245, 253 (Tex. 2004) (citations omitted).

    A two-part test governs whether expert
testimony is admissible:  (1) the expert must be qualified; and (2) the
testimony must be relevant and based on a reliable foundation.  Helena Chem.
Co. v. Wilkins, 47 S.W.2d 486, 499 (Tex. 2001).  A trial court is not to
determine whether an expert’s conclusions are correct, but only whether the
analysis used to reach those conclusions is reliable.  Gammill v. Jack
Williams Chevrolet, Inc., 972 S.W.2d 713, 728 (Tex. 1998).

    In determining the reliability of an expert’s
opinion, the Texas Supreme Court has provided a list of factors to consider: 
(1) the extent to which the theory has or can be tested; (2) the extent to
which the technique relies upon the subjective interpretation of the expert;
(3) whether the theory has been subjected to peer review and publication; (4)
the technique’s potential rate of error; (5) whether the underlying theory or
technique has been generally accepted as valid by the relevant scientific
community; and (6) the nonjudicial uses that have been made of the theory or
technique.  E.I. du Pont de Nemours and Co., Inc. v. Robinson, 923
S.W.2d 549, 556 (Tex. 1995); In re J.B., 93 S.W.3d 609, 620 (Tex.
App.—Waco 2002, pet. denied).

    Though helpful, the Robinson factors
may not be applicable in every case.  While Rule 702 governs testimony based
upon “scientific, technical, or other specialized knowledge,” the Texas Supreme
Court has acknowledged a potential difference between expert testimony based on
scientific methodology and that based on experience.  Tex. R. Evid. 702; Gammill, 972 S.W.2d at 726.  The
Court emphasized that despite the difficulty in applying the Robinson
factors in these cases, the reliability of non-scientific expert testimony must
still be reviewed.  Gammill, 972 S.W.2d at 727.  Therefore, a reviewing
court may also consider other factors, including whether the analytical gap between
the data and the expert’s testimony is too great to be reliable.  Id.

        Relying upon Gammill, we first
apply the Robinson factors, although only a few, or perhaps none, of the
factors will be helpful in a particular case.  J.B., 93 S.W.3d at 621. 
Then we exercise our discretion to “identify and employ other factors as
necessary to assess the reliability of the proffered testimony.”  Id. (citing Wilkins, 47 S.W.3d at 499).




Lineberger’s Testimony

I.  Qualifications

    Lineberger graduated from the University of Texas in 1982 with a bachelor of engineering science degree, specializing in meteorological
engineering.  In 1988, he received his Professional Engineering license from
the Texas Board of Professional Engineers.  He is a member of the American
Society of Engineers, American Concrete Institute, and the National Association
of Professional Engineering.

    After graduating, he worked for a public
utility firm building underground structures.  His next two jobs were for
companies involved in the storage and transportation of liquid petroleum
products and natural gas.  In 1995, Lineberger formed a home building company
that built low income housing.  Lineberger hired an engineer to design the
foundations of the approximate 125 homes built by his company.  In 2000,
Lineberger was hired by Systek, an engineering and construction company, and
worked in a marketing position.  During this time, Lineberger met Bruce Mary,
an attorney who was interested in hiring Systek to conduct forensic
investigations of residential foundations.  After Systek closed its office in San Antonio, Lineberger formed Lineberger Consulting Engineers and began researching how
to perform forensic foundation investigations.  Up to that point, he had never
performed a forensic investigation of a residential foundation.

    Lineberger’s first client was Mary who gave
him ten to twenty cases.  After he formed his company, Lineberger met Stephen
Boyd, the Blacklocks’ attorney, at a legal expo where vendors market their
services to the legal community.  Lineberger’s work includes 75% forensic work
and 25% construction consulting.  The majority of Lineberger’s forensic
foundation work is for homeowners with only one insurance company client.  At
the time of the trial, Lineberger had conducted 250 to 275 forensic foundation
investigations.

II.  Opinions as to Causation

    Lineberger concluded that all the interior
and exterior damage in the house was caused by the plumbing leaks.  Lineberger
testified that the Blacklocks’ home is built on expansive clay, and when large
amounts of water from a plumbing leak flow into the clay, it expands in volume. 
The expanding clay produces tons of upward pressure on the foundation.  He
explained that the Blacklocks’ foundation did not have enough downward weight
to counteract this upward pressure, and that this caused the foundation to heave
upwards.  Lineberger testified that the heaving upwards-movement of a
foundation can separate the rafters from the ridge beam and cause cracks in the
walls, which was the very damage that occurred at the Blacklocks’ house.

    State Farm’s experts agreed with
Lineberger’s conclusions that the plumbing leak caused the foundation to heave
and this subsequently damaged the home.  The experts disagreed as to the extent
of the damage directly caused by the leak, i.e., what damage was caused
by the heaves and what damage was caused by other means.  State Farm’s expert,
Ricky Richards, testified that the damage caused by the plumbing leaks was
confined to the areas of the house where the leaks occurred.  Richards
attributed any damage outside of these areas to seasonal moisture changes,
specifically severe drought.  Lineberger did not agree.  He testified that all
the damage in the house was caused by the plumbing leaks.

        Lineberger testified that seasonal
moisture changes could not have caused the damage to the interior of the house because
seasonal moisture damage typically occurs around the perimeter of the house and
cited a Building Research and Advisory Board report that stated that seasonal
moisture changes would not effect the middle of the house.  Lineberger pointed
to several pictures of interior and exterior cracks in the Blacklocks’ home showing
how the cracks were wider at the top than at the bottom.  He stated that this
was the typical anatomy of cracks formed due to upward movement, such as a
heave, and not seasonal movement which tends to be in a downward direction.  According
to Lineberger there was no evidence of drainage problems, and the location of
trees and the elevation patterns of the house were inconsistent with damage
caused by tree roots.  He testified that because the house was twenty-seven
years old and had withstood seasonal changes up until that time, seasonal
moisture changes were not the cause of the damage.  Lineberger reasoned that
because the problems with the house occurred suddenly and corresponded with
confirmed plumbing leaks, and because the Blacklocks’ house was built on a
lightly loaded slab-on-grade foundation with expansive soils and exhibited distortion
that exceeded acceptable thresholds, then it was logical to conclude that the
leaking plumbing caused all of the damage to the Blacklocks’ home.  

    However, State Farm argues that Lineberger’s
testimony is unreliable because he fails to show how the plumbing leaks caused
damage to the house in areas distant from the leak.

    Lineberger agreed with Norseman
Engineering’s portrayal of the elevations of the house.  Lineberger’s study
revealed almost identical relative elevations.  He agreed that generally
speaking a person would tend to see higher spots in the house near the leak
rather than distant from the leak.  He agreed that generally a heave is
greatest in the area of the leaks and lessens as one moves farther from the source
of the leak.  Yet, Lineberger also admitted that the highest spot in the house
was in the front entryway, some distance away from the leaks, while the areas
around the leaks were two inches lower than the entryway.  State Farm argues
that it is Lineberger’s inability to explain why the high point in the house is
distant from the leak that causes his opinion to be unreliable.

    However, Lineberger explained that the
reason the high point is some distance away from the leaks is that over time the
house became tilted from east to west in a uniform planer fashion, and after
the leaks occurred localized bulges appeared near the leaks.[1] 
He also testified that damage occurred at a distance from the leak because the
beams in the concrete foundation are more stiff than the surrounding concrete. 
When there is upward pressure on a beam in the concrete foundation, and the
beam becomes distorted, the entire beam itself rises causing damage distant
from the area surrounding the leak.[2]

III.  Repair Plan – 100% Full Piering

    Lineberger testified that in order to fix
the problem with the foundation the house required full piering.  He explained
that piering is the placement of concrete piers underneath the foundation of
the house, and it was his recommendation that the Blacklocks house be fully
piered, that is, piers placed under the exterior and interior points of the entire
foundation.  Lineberger testified that this technique changes a slab-on-grade
foundation to a fixed foundation.

    In the approximate 200 cases in which
Lineberger determined that a plumbing leak damaged a foundation, he recommended
full piering in all of those cases.  Lineberger admitted that this was the most
expensive method to repair a foundation, but he insisted that full piering must
be done.  Lineberger explained that a house with a slab-on-grade foundation,
like the Blacklocks’ home, floats above the soil as a single unit.  Therefore,
when damage to the foundation occurs, the slab must be repaired as one unit.  Lineberger
reasoned that if piers were placed on one side of the house only, leaving the
other side supported by soil, then the foundation would float on the soil on
one side and rest in a fixed state on piers on the other.  Lineberger testified
that this could cause stress on the foundation, causing the foundation to act
as a hinge as one side of the foundation moves with the soil while the other
side supported by piers withstands movement.  Lineberger stated that this
hinge-like movement could cause further damage.

    On cross examination, Lineberger was asked
to give authority for his recommendation that the Blacklocks’ home should be
fully piered.  Lineberger testified that the guidelines promulgated by the
American Society of Civil Engineers support his position for full piering, but
later stated that the guidelines imply full piering but never explicitly state
that an engineer should fully pier a foundation.  Also, Lineberger testified
that he relied on an authoritative book on foundation behavior and repair
called Practical Foundation Engineering Handbook by Robert Wade Brown. 
However, State Farm presented evidence that Brown does not agree with full
piering and instead endorses piering the perimeter of the house and then
pumping a slurry of concrete and mud under the interior, a process known as
mudjacking.  Lineberger agreed that Brown uses that method, but he disagreed
with the method because it does not treat the foundation as a unit.

    When asked if he knew of any authoritative
text that recommends full piering as a method of foundation repair because the
foundation is a single unit, Lineberger replied that he did not know of any. 
When asked if he could cite to any authority that was against partial piering,
Lineberger testified that the number of documents he has studied when taken together
with his experience and knowledge caused him to consider it good judgment to
fully pier a foundation.  Lineberger also referred to other working engineers,
all employed by plaintiffs’ attorneys, who supported his theory.

    Indeed, State Farm’s expert testified that
he was aware of engineers that were employed by insurance companies that agreed
with Lineberger’s full-piering philosophy.  Also, Lineberger’s repair plan is
almost identical to the repair plans proposed by Linehan and State Farm’s
experts, Jason Womack and Gerald Kunkle.  State Farm’s experts agreed that the
Blacklocks’ home required partial interior and exterior piering, however they
testified that the need for piering was due to seasonal moisture changes
causing settlement and not because of the plumbing leaks.  What is more,
Lineberger testified that fully piering a foundation would solve problems
caused by seasonal moisture changes but would have no preventative effect
should a plumbing leak reoccur.[3]

    Lineberger testified that the repair plan
was conceptual and would change upon further investigation.  He could not state
the number of piers needed because a geotechnical engineer would need to
investigate the foundation to determine the location of the interior and
exterior beams.  However, Lineberger testified that any changes to the repair
plan would not materially affect the number of piers needed or the price.

Gammill:  The Analytical Gap Test

    State Farm argues that the above recited
evidence proves that there exists an analytical gap between the data and
Lineberger’s opinions, and therefore Lineberger’s opinions are unreliable.  In
their briefs, both parties argue that the reliability of an expert’s opinion in
foundation repair cases should be analyzed using the analytical gap theory.  

    When analyzing cases involving foundational
damage that is allegedly caused by plumbing leaks, some courts have used the
analytical gap theory promulgated by Gammill.  972 S.W.2d at 727; Allstate
 Texas Lloyds v. Mason, 123 S.W.3d 690 (Tex. App.—Fort Worth 2003, no pet.);
United Services Auto. Ass’n v. Gordon, 103 S.W.3d 436, 439 (Tex. App.—San Antonio 2002, no pet.).  If too great an analytical gap exists between the
data and the expert’s opinion, or if the expert fails to rule out other
possible causes of the foundation movement, then the trial court abuses its’
discretion in admitting the testimony.  Gammill, 972 S.W.2d at 727; Gordon,
103 S.W.3d at 439.  We are not to determine whether the expert’s conclusions
are correct, but only whether the analysis used to reach them was reliable.  Gammill,
972 S.W.2d at 727; Gordon, 103 S.W.3d at 439.

    Allstate Texas Lloyds v. Mason is a
case with similar facts as the one before us.  123 S.W.3d 690.  In that case,
the Second Court of Appeals analyzed whether the trial court erred in admitting
the testimony of Mason’s expert, Jim Linehan.  Id. at 697.  It was
Linehan’s testimony that a plumbing leak caused all the damage to Mason’s house,
even though foundational damage due to soil movement had occurred and been repaired
six years earlier.  Id. at 700-01.  Linehan testified that there had
been no further damage to the house in the six years after the initial
foundation damage had been repaired, and then damage occurred suddenly
corresponding with confirmed plumbing leaks.  Id. at 701.  Linehan testified
that the sudden onset of damage, confirmed leaks, foundational uplift at the
leak, and expansive soils were all objective data that confirmed his opinion
that all the damage to the house was caused by the plumbing leaks.  Id.  The court of appeals found that no analytical gap existed and that Linehan’s
testimony was reliable because he negated the possibility of other causes of
damage to the house, including soil movement and seasonal moisture changes.  Id. at 702.

    In United Services Automobile Association
v. Gordon, USAA argued to the Fourth Court of Appeals that the trial court
should have excluded the Gordons’ expert, James Andrews.  103 S.W.3d at 438.  Andrews
testified that all the damage in the Gordons’ home was caused by plumbing
leaks.  Id.  Andrews relied on the same testing data as USAA and ruled
out seasonal changes as the cause of the damage because seasonal moisture
damage effects only the perimeter of the house.  Id. at 439.  Andrews
testified that foundational movement due to moisture changes slows or stops
fifteen years after the house is built, and the Gordons’ significant damage
occurred after the fifteen year period.  Id. at 440.  The court of
appeals found that Andrews’s testimony was reliable.  Id. at 440-41.

    Lineberger had similar testimony and similar
explanations as the experts in the above cases that were considered reliable. 
Lineberger negated seasonal moisture and vegetation as the cause of the
damage.  He testified that the sudden onset of the damage after a period of
years without any damage, confirmed plumbing leaks, expansive soils, and a
lightly loaded foundation were objective data that he used to support his
opinion that the leaks caused all the damage to the Blacklocks’ home.  Though State
Farm argues that Lineberger’s failure to explain the cause of the high point in
the entryway is proof that an analytical gap exits, the record reveals that
Lineberger did explain how the high point was caused and why damage in the
house occurred some distance away from the leak.  Lineberger did not base his
opinions on unsupported speculation or subjective belief.  Both Lineberger and
State Farm’s experts came to different conclusions as to the cause of the
damage, yet we are not to decide who’s theory is more or less correct, but
whether the analysis used to reach these conclusions is reliable.  Mason,
123 S.W.3d at 697.

    Given the above testimony of Lineberger, it
seems clear that under Gammill’s analytical gap test, his analysis is
reliable.  However, the analytical gap test is not exclusive, and we may rely
upon other factors to assess the reliability of expert testimony.  J.B.,
93 S.W.3d at 621.  State Farm also argues that Lineberger’s testimony is
unreliable and should not have been admitted because his testimony was procured
for litigation purposes only.  




Robinson - For Litigation Purposes Only

    State Farm presented evidence that
Lineberger formed his forensic foundation company upon the suggestion of Mary,
a plaintiff’s lawyer who represents homeowners in foundation claims.[4] 
Prior to forming his company in 2001, Lineberger did not have experience in
forensic investigations of residential foundations.  Lineberger testified that
Mary gave him foundation inspection reports from other engineers as an
educational tool.[5] 
The authority that Lineberger relies upon in giving his expert opinions, Practical
Foundation Engineering Handbook by Robert Wade Brown, was given to him by
Mary.[6]

    State Farm also presented evidence that the
Blacklocks’ attorneys had already determined the cause of the damage and the
type of repairs needed before Lineberger was retained as an expert.  Lineberger
was hired by the Blacklocks on January 8, 2003.  An engagement letter from the
Blacklocks’ attorney to Lineberger entered into evidence confirms this date. 
Lineberger examined the Blacklocks’ home for the first time on January 20,
2003.  However, in a supplemental response to State Farm’s request for
disclosure dated December 19, 2002, the Blacklocks identified Lineberger as a
testifying expert and disclosed that Lineberger had already concluded that the
foundation damage was caused by plumbing leaks and that the home would need to
be fully piered.  The Blacklocks stated in the disclosure that “Mr. Lineberger
is of the opinion that the elevations, damage distributions and history of the
home all support the conclusions that the Plaintiffs’ home was damaged as the
result of these plumbing leaks . . .” and “[i]s of the opinion that the damage
to the foundation and the need to repair the foundation by way of piering was
caused by the leaks known to have existed at the home.”  The disclosure
purports to relay Lineberger’s opinion on the Blacklocks’ home a month before
Lineberger had inspected the home, and three weeks before Lineberger was hired
as an expert.

    When confronted with this evidence at trial,
Lineberger testified that he did not make his opinion before he inspected the
house, and any conclusions he made concerning the Blacklocks’ home were made
after the January 20 inspection.  He testified that prior to this inspection he
had no idea whether a plumbing leak had caused the damage or whether the
foundation required full piering.[7]  

    Furthermore, in a deposition taken before
trial, Lineberger testified that if the plaintiff’s lawyer requests full
piering, he recommends it.  Lineberger stated, “Basically, what it amounts to
is if they request that I recommend full piering, I recommend it if the
foundation and superstructure are damaged.  If they don’t recommend it, then I
don’t.”

    “The fact that an opinion was formed solely
for the purposes of litigation does not automatically render it unreliable.”  Robinson,
923 S.W.2d at 559.  Yet, it is a factor that weighs against the admissibility
of an expert’s testimony.  Id.  The analysis and the conclusions of
Lineberger in all respects appear to be reliable under the Gammill
analytical gap test.  See Mason, 123 S.W.3d at 702.  However, “when an
expert prepares reports and findings before being hired as a witness, that
record will limit the degree to which he can tailor his testimony to serve a
party’s interests.”  Robinson, 923 S.W.2d at 559 (quoting Daubert,
43 F.3d at 1317 (upon remand)).  Also, “opinions formed solely for the purpose
of testifying are more likely to be biased toward a particular result.”  Id.

    In this case, the Blacklocks through their
attorney disclosed an expert’s opinions before the expert was hired as a
witness.  Lineberger’s repair plan, while supported by more than the ipse
dixit[8]
of the expert, did not have the support of published authority.  The very
reference book touted by Lineberger as authoritative and purchased for him by
Mary does not agree with Lineberger’s repair plan.  This fact when coupled with
Lineberger’s illuminating statement that his repair plan recommendations are
dictated by the opinions of attorneys who hire him, reveal the true source of
Lineberger’s opinions.  Under these circumstances, perhaps Justice Keasler is correct
in his belief that courts should conduct a de novo review of the reliability
of an expert’s opinion.[9]  See
Hernandez v. State, 116 S.W.3d 26, 50 (Tex. Crim. App. 2003).  Regardless,
the evidence is clear that Lineberger’s testimony was orchestrated for
litigation purposes only, and Lineberger’s opinions regarding his repair plan were
not sufficiently supported by authority or accepted as valid by the relevant
scientific community.  Robinson, 923 S.W.2d at 556.  Therefore, applying
the Robinson factors, we find that Lineberger’s testimony is
unreliable.  See J.B., 93 S.W.3d at 621.

Linehan’s Report

    State Farm argues that the trial court
abused its discretion in admitting the repair plan and report of James Linehan
because it is unreliable.

    Linehan was not called to testify, but his
report was admitted into evidence and was used by Lineberger in his testimony. 
In State Farm’s Daubert/Robinson challenge to Linehan, it argued that
there was an analytical gap between the hard data and Linehan’s conclusion that
all of the foundation damage was caused by the plumbing leaks.  Linehan’s
report does not state how much elevation change occurred as a result of the
plumbing leaks and how much foundation movement was due to settlement.  Also,
Linehan does not cite to any recognized authority within the engineering field
to support his opinion that the foundation must be fully piered.

    After State Farm objected to the Linehan
report at the hearing, the burden shifted to the proponent of the evidence to
prove the reliability of the expert’s opinions.  Gammill, 972 S.W.2d at
718-19.  The Blacklocks’ responded to State Farm’s motion by stating that “Mr.
Linehan, the other engineer he’s complaining about, was accepted in Federal
court.  The court finds Linehan’s testimony to be sufficiently reliable.  We
think that not only was Mr. Lineberger’s testimony reliable, it should be
admissible in this case.  We ask the Court to deny the motion and proceed on.” 
Thus, the Blacklocks’ response fails in its attempt to prove by a preponderance
of the evidence that Linehan’s report was reliable and relevant.  See id. 
Accordingly, we find that Linehan’s report is unreliable.

Pennington’s Report 

    State Farm argues that the trial court
abused its discretion in admitting the damage report of the Blacklocks’ expert,
Gary Pennington, because his opinion is unreliable.  Pennington’s report states
on its face that his estimates are based entirely on the Linehan report. 
Pennington’s damage assessment consists of a numerical bid based on the cost of
implementing Linehan’s plan of fully piering the Blacklocks’ foundation.  It
has already been demonstrated that both Lineberger and Linehan could not cite
to any authority that the method of fully piering a foundation was acceptable. 
Because Linehan’s report should not have been admitted, Pennington’s estimate
that wholly relies on Linehan’s report cannot serve as an admissible basis for
damages.  The Texas Supreme Court has held that “if the foundational data
underlying opinion testimony are unreliable, an expert will not be permitted to
base an opinion on that data because any opinion drawn from that data is
likewise unreliable.”  Merrell Dow Pharmaceuticals, Inc. v. Havner, 953
S.W.2d 706, 714 (Tex. 1997); see Royce Homes, L.P. v. Neel,
10-03-00127-CV, 2005 Tex. App. LEXIS 1514 (Tex. App.—Waco 2005, pet. filed); Martinez
v. City of San Antonio, 40 S.W.3d 587, 594 (Tex. App.—San Antonio 2001, pet
denied) (holding expert’s opinions lacked reliable foundation because testimony
relied on another expert’s underlying calculations that had been stricken from
evidence).

    Additionally, Linehan’s report is not suitable
for obtaining bids.  Linehan’s report states that “[t]he preliminary foundation
repair pier plan included herein this report is for estimating only and not
valid for obtaining bids nor is it suitable for construction.”  On
cross-examination, Pennington conceded that a new plan would have to be drawn
for the actual construction of the repairs, and that until that was done the
price of the piering was unknown.  He even agreed to the word ‘speculative’ to
characterize his own estimates of cosmetic repair.  He testified that the total
cost of the repairs depended on the number of piers and that it was impossible
to state the number of piers that would be needed.  Furthermore, Pennington had
not checked to see if the prices he quoted in his report were usual and
customary for Johnson County, where the Blacklocks’ house is located.

    Given the above, we find that Pennington’s
damage report is unreliable.  See Havner, 953 S.W.2d at 714.

Conclusion








    Because the opinions of the Blacklocks’
experts, namely, Lineberger, Linehan, and Pennington, are unreliable, there is
no evidence to support the Blacklocks’ theory of causation or of the amount of
damages awarded by the trial court.  See Kerr-McGee Corp., 133 S.W.3d at
258.  Therefore, we sustain State Farm’s first issue.  Because State Farm’s
first issue is dispositive of this case, we will not address its other issue. 
We reverse the decision of the trial court and render judgment that the
Blacklocks take nothing.

 

                                                                     FELIPE
REYNA

                                                                    Justice

 

Before Chief Justice
Gray,

    Justice Vance, and

    Justice Reyna

Reversed and rendered

Opinion delivered and
filed September 7, 2005

[CV06]









[1]   Q:  So I take it since [the leaks], in part, caused the
high spot in your theory and, in part, caused the low spot, other forces also
worked on this house to cause one area to be on this chart at three and a half
inches and other     areas to be as low as one-eighth inch and one-quarter inch
and zero?

     A:  Yes, sir, that’s correct.

     Q:  What are those other causes?

     A:  The foundation itself, as we discussed yesterday,
is designed to float.  That’s how we design foundations,    to float, to float
on the native soils upon which they’re founded.  And the way that they’re
designed is to float     in a planer fashion, in other words, flat like a
table.  What has happened at the Blacklock house is that the      foundation
has, in fact, tilted, what they call tilted.  And it has tilted . . . upward on
the right side of the house    and downward on the left side.

* * * * * * 

     A:  We have a uniform tilting in combination with
localized heave produced by leaks.  The foundation itself     has titled to the
right side and down to the left, and then all about, oh, 2001, early spring of
2001, we had a s     situation where we had a leakage and the leakage caused,
now, these nonuniform heave areas near the leaks    and also somewhat distant
from the leaks as well.

 





[2]   A:  [t]he heave pushes up not only on the slab, but
also on the steal beams in the slab.  When it pushes up on    those beams, it
also distorts areas away from the leaks because those beams are stiff.  And
when you push up      on these beams, not just one single area of those beams
is going to go up but the whole beam itself would tend to rise.  So you’re
going to get distortion not only near the leak but also distant from the leak.

 





[3]   Q:  If we have a new plumbing leak on any house that
has been fully piered, that house can still bulge up?

     A:  Oh, yes, sir.  Yes, sir.

     Q:  And the piers really provide no protection against
future plumbing leak damage?

     A:  They - - if you have a plumbing leak, you’re
going to have those soils swelling just like they did at the   Blacklock
house.  You’re going to have uplift.  And since we designed these piering
systems interior and     exterior to restrict downward movement and not upward
movement, when you have a catastrophic event like   plumbing leak, you will
lift the foundation off the piers.

     Q:  Just lift it right up off the piers because
that concrete stiffens.  As the soil swells, the concrete’s just going     to
be shoved up, right?

     A:  Yes, sir.

     Q:  So you would agree with me that the full
piering plan being proposed here is a plan that will solve the   things State
Farm says is wrong with the house, which is settlement over time in the
direction of the natural     slope of the lot, it will solve that, right?

     A:  Yeah.  I mean, the full piering will restrict
downward movement, simply put.

 





[4]    Q:  And it was Mr. Mary’s suggestion that
you go into this business of forensic foundation investigation?

     A:  He had
asked me to look into it.

     Q:  And you
took his suggestion?

     A:  Yes,
sir.

 





[5]    Q:  [Mr. Mary] introduced you to the reports
of some other engineers?

     A:  Yeah,
you could say introduced.  I asked him for some examples, yes, sir.

     Q:  And he
gave you examples of other engineering reports by engineers who had helped his
law firm?

     A:  That’s
correct.  Also some engineers that worked for insurance companies as well.

 





[6]    Q:  And Mr. Mary not only pointed you to the
Brown book, he ordered it for you, didn’t he?

     A:  He sure
did.

     Q:  And
that’s when you started looking at it and what it had to say on foundation
engineering, correct?

     A:  Yes,
sir.





[7]    Q:  But your conclusions were made on or
after January 20 and before you made your report in February,    correct?

     A:  Yes, sir.

     Q:  And there’s no doubt in your mind – you didn’t make your
opinion back here before you went to the house, did you?

     A:  No, sir.

     Q:  You had no idea whether a plumbing leak had caused the
damage or not, did you?

     A:  No, sir.

     Q:  No idea whether it needed full piering or not, did you?

     A:  Correct.





[8]    The literal meaning is “he himself said
it.”  It means something said but not proved.  Dictionary of Modern Legal
Usage 313 (Bryan A. Garner ed., 1st ed., Oxford 1987).

 





[9]   “[a] judge without special training finds it hard to
criticize an expert’s methods of gathering data or the     inferences he draws
from them.  Yet experts are fallible.  Worse, they have axes to grind--at least
professional      axes . . . ultimately there is no way for the conscientious
judge to escape making a determined effort to learn   enough about the subject
matter of the litigation to formulate his own views with the assistance--not
the   domination--of the experts.”  Hernandez v. State, 116 S.W.3d 26,
50 (Tex. Crim. App. 2003) (Justice      Keasler, dissenting) (quoting Kenneth
L. Karst, Legislative Facts in Constitutional Litigation, 1960 Sup. Ct.    Rev. 75, 105-06 (1960)).